CHARLENE LONG,

        Plaintiff,

                                   Civil Action 2:11-cv-00343
vs.                             Judge Algenon L. Marbley
                               Magistrate Judge Elizabeth P. Deavers

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

Plaintiff, Charlene Long, filed this action seeking review of a final decision of the

Commissioner of Social Security ("Commissioner") denying her applications for social security

disability insurance benefits and supplemental security income.  Plaintiff alleges that she has

been disabled since January 30, 2001, due to various conditions including depression and mental

illness.  (R. at 99, 109, 265.)

After administrative denials of her claims, Plaintiff appeared and testified at a hearing

before Administrative Law Judge ("ALJ") Paul R. Armstrong on April 16, 2007.  (R. at

354–412.)  On July 12, 2007, ALJ Armstrong issued an unfavorable decision denying disability.

(R. at 73–80).  Upon Plaintiff's request, on July 15, 2008, the Appeals Council granted review of

ALJ Armstrong's decision and remanded for further consideration of the evidence and Plaintiff's

residual functional capacity.  (R. at 65–67.)

Accordingly, on June 22, 2009, Plaintiff received an administrative hearing before ALJ

Barbara Beran.  Plaintiff, as well as a vocational expert, testified at this hearing.  (R. at 413–76.)

On September 28, 2009, ALJ Beran issued a written decision finding that Plaintiff was not

disabled.  (R. at 29–52.)  This decision became the final decision of the Commissioner when the

Appeals Council denied review on February 18, 2011.  (R. at 4–6.)

Plaintiff thereafter timely commenced this civil action.  In her Statement of Errors,

Plaintiff contends that ALJ Beran failed to follow the Appeals Council's instructions on remand.

Plaintiff's specific contentions include that the ALJ failed to properly evaluate the opinions of

examining physicians, failed to properly evaluate the impact of Plaintiff's mental impairments,

and failed to obtain additional evidence.  Following the Commissioner's Memorandum in

Opposition and Plaintiff's Reply, this matter is now ripe for review.  For the reasons that follow,

it is **RECOMMENDED** that the Court **AFFIRM** the decision of the Commissioner.

## II.  PLAINTIFF'S TESTIMONY

Plaintiff, who was fifty seven at the time of the June 2009 administrative hearing, has a

GED as well as a year and a half of training at a technical institute.[1]  (R. at 419–20.)  Her past

employment included work as a parking valet, chauffeur for a shuttle bus, and psychic.  (R. at

425, 427, 429.)

At the administrative hearing, Plaintiff testified that she has struggled with mental

problems since 1970.  (R. at 432.)  Plaintiff stated that she has to take medication because she is

not able to function normally.  (R. at 434.)  According to Plaintiff, this medication decreases her

energy level and interferes with her thought process.  (R. at 435–37.)  Plaintiff suggested that her

---

[1]  As noted above, Plaintiff also testified at an administrative hearing in April 2007.
Although the Court has considered this testimony in conducting its review, the following
summary will focus on Plaintiff's June 2009 testimony before ALJ Beran.

inability to function normally leads her to depression.  (R. at 450.)

Plaintiff testified that she suffered a brain injury in 2000 when she was assaulted and broke her nose.  (R. at 425, 437.)  Plaintiff indicated that before the injury she had been reading and writing at a college level, but that after the injury she struggled with reading and writing as well as basic math.  (R. at 437.)  She also testified that since her brain injury she had problems with her memory as well as socialization.  (R. at 453.)  Plaintiff stated that she has daily head pain, which she rated as an eight on a ten point pain scale.  (R. at 437–38.)  Finally, Plaintiff testified to having a bullet fragment in her jaw from a previous incident, which still causes her pain.  (R. at 451–52.)

In describing daily activities, Plaintiff stated that she was able to groom and take care of herself.  (R. at 439.)  She was able to do various chores including making her bed, preparing meals, washing dishes, laundry, vacuuming, and taking out the trash.  (R. at 439–40.)  Additionally, Plaintiff testified to walking to the grocery store and shopping, but she indicated that this is often an overwhelming experience.  (R. at 440–41.)  Plaintiff stated that she watches television, but denied any other hobbies.  (R. at 441.)  She noted that she has problems with, and does not enjoy, socializing with others.  (R. at 442–43.)  Plaintiff reported that she sees her grandchildren about once a month.  (R. at 443.)

At the time of her second administrative hearing Plaintiff indicated that she had a brief alcohol relapse in May 2008, but prior to that had not drank for two years.  (R. at 421.)  Plaintiff stated that it had been five years since she used illegal drugs.  (R. at 422.)

### III.  MEDICAL RECORDS

The record reflects that Plaintiff received treatment from Netcare in October 2002.  (R. at

249.) Plaintiff reported both anxiety and depression. (*Id.*) Her statements regarding alcohol use were inconsistent. (*Id.*) Plaintiff's social worker noted that her self-reports appeared unreliable. (R. at 251.) Plaintiff suggested that she believed she had "special powers," but did not report hallucinations at that time. (*Id.*) Plaintiff noted that she enjoyed reading and writing poetry, and discussing philosophy. (R. at 254.) The social worker diagnosed Plaintiff with schizoaffective disorder and alcohol dependence, and assigned Plaintiff a global assessment of functioning ("GAF") score of 50.[2] (R. at 256.)

Plaintiff returned to Netcare in May 2003. Her social worker, who had also seen Plaintiff for her October 2002 visit, noted "marked inconsistencies between her presentation in 10/2002 and her presentation today." (R. at 241.) The social worker opined that the differences might be explained by an attempt to gain "material assistance." (R. at 241.) The social worker linked Plaintiff's presentation to drug use, and felt there was sufficient evidence to rule out the 2002 diagnosis of schizoaffective disorder. (R. at 241–41A.) Plaintiff's social worker again suggested that Plaintiff's self-report appeared unreliable and noted no indications of hallucinations. (R. at 242.) The social worker diagnosed Plaintiff with alcohol and cocaine dependence, referred her to a substance abuse program, and assigned her a GAF of 55.[3] (R. at

_____

[2] "GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009). "A GAF score of forty-one to fifty indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 665 n.2 (6th Cir. 2009) (internal quotations omitted).

[3] "A GAF score of fifty-one to sixty indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Collins*, 357 F.

247.)

In September 2003, John L. Tilley, Psy.D., performed a consultive examination of Plaintiff at the request of Franklin County Department of Job and Family Services. (R. at 144–53.) Plaintiff presented with overt psychosis including delusional beliefs. (R. at 144.) Dr. Tiley noted that this presentation interfered with Plaintiff's "ability to act as a reliable historian." (*Id.*) Additionally, Dr. Tilley's report indicates that he did not have the benefit of Plaintiff's historical records. (*See* R. at 144, 150.) Plaintiff explicitly denied any history of alcohol and illicit drug use, but at the same time also implied a history of alcohol abuse. (R. at 146.) Dr. Tilley noted that Plaintiff engaged in several odd mannerisms during the interview and at one point became "possessed with anger in association with her persecutory delusions." (R. at 146–47.) During the examination, Plaintiff "evidenced considerable delusions of grandiosity," including the belief that she was capable of interplanetary travel. (R. at 147.) Plaintiff also reported auditory hallucinations. (*Id.*)

Testing during Dr. Tilley's examination revealed that Plaintiff was reading at a twelfth grade level, spelling at a sixth grade level, and performing numerical operations at a third grade level. (R. at 148.) Dr. Tilley cautioned, however, that given Plaintiff's mental states, the results "most probably represent[ed] moderate to gross underestimations of her true abilities." (R. at 148.) Dr. Tilley found personality testing results invalid, opining that "an indiscriminate and exaggerated response pattern [was] probable." (R. at 149.) Ultimately, Dr. Tilley diagnosed

App'x at 665 n.2 (internal quotations omitted).

Plaintiff with schizoaffective disorder, bipolar type, and assigned Plaintiff a current GAF of 19.[4] (R. at 150.)  Dr. Tilley felt that Plaintiff's symptoms were not due to the direct effects of substance abuse.  (R. at 149.)

Dr. Tilley opined that Plaintiff was unemployable from a psychological perspective.  (R. at 150.)  Dr. Tilley also completed a mental functional capacity assessment in September 2003.  (R. at 152–53.)  He opined that Plaintiff was either markedly or extremely limited in almost every one of the listed work-ability categories.  (*Id.*)

Psychologist T. Rodney Swearingen, Ph.D., saw Plaintiff in November 2003 for a consultive psychological evaluation.  (R. at 222–27.)  Plaintiff was able to take the bus to this appointment, but was fifteen minutes late.  (R. at 222.)  Plaintiff explained to Dr. Swearingen that she had posttraumatic stress disorder.  (*Id.*)  Plaintiff reported three suicide attempts in her past, with the last one being an attempted overdose in 2000.  (R. at 223.)  She also reported having problems with alcohol and drugs.  (R. at 223.)

In discussing anxiety, Plaintiff stated that she feels nervous about changes, memory problems, and her "different personalities."  (R. at 224.)  Plaintiff told Dr. Swearingen that "she sees ghosts, extraterrestrials, and beast[s] talking to her."  (R. at 224.)  Plaintiff also suggested she was able to read minds and exhibited delusional thinking.  (*Id.*)  Plaintiff, however, experienced no auditory or visual hallucinations during the examination.  (*Id.*)

Dr. Swearingen diagnosed Plaintiff with posttraumatic stress disorder; schizophrenia, paranoid type; alcohol dependence, early partial remission; unknown substance dependence,

---

[4] "A GAF score below 20 indicates some danger of hurting oneself or others, and/or an occasional failure to maintain minimal personal hygiene or grossly impaired communication." *Karger v. Comm'r of Soc. Sec.*, 414 F. App'x. 739, 740 n.1 (6th Cir. 2011).

6

early partial remission; and personality disorder.  (R. at 215.)  Dr. Swearingen estimated that

Plaintiff's current GAF, as well as highest GAF in the past year, was 21.[5]  (R. at 225.)  In terms

of work ability, Dr. Swearingen found Plaintiff's ability to relate to others to be poor; her ability

to remember and follow instructions to be fair; her ability to maintain attention and concentration

to be average; and her ability to withstand stress and pressure to be impaired.  (R. at 226.)

In December 2003, after reviewing evidence in Plaintiff's file, Vicki Casterline, Ph.D.,

referred Plaintiff's case to the Cooperative Disability Investigations Unit ("CDIU").  (R. at 217.)

Dr. Casterline felt that Plaintiff's record at that time, including Dr. Swearingen's report, was

suggestive of malingering.  (R. at 217.)  Ultimately, the CDIU did not feel that the case met the

prosecutory guidelines required for further action.  (R. at 211.)

In March 2004, Plaintiff received a psychiatric evaluation from C. Flanagan, D.O., at the

North Community Counseling Center.  (R. at 288–91.)  Plaintiff presented with stress due to her

homelessness, joblessness, and mental status.  (R. at 288.)  She was not on medication at the

time.  (R. at 289.)  Dr. Flanagan described Plaintiff's thought process as grandiose, but noted that

Plaintiff denied auditory hallucinations or paranoia.  (R. at 290.)  Dr. Flanagan diagnosed

Plaintiff with bipolar disorder; alcohol dependence, in early remission; and cluster B personality

traits.  (R. at 291.)  He assigned Plaintiff a GAF ranging from 70 to 75 and prescribed

medication.[6]  (R. at 291.)

---

[5]  "A GAF score of 21 to 30 indicates behavior considerably influenced by delusions or
hallucinations, serious impairment in communication or judgment, or an inability to function in
almost all areas."  *Cole v. Comm'r of Soc. Sec.*, No. 3:11–cv–199, 2012 WL 1122712, at *3 n.2
(S.D. Ohio Apr. 3, 2012).

[6]  "GAF scores in the range of 61–70 are intended to indicate some mild symptoms or
some difficulty in social, occupational, or school functioning . . . ."  *Karger*, 414 F. App'x at

Plaintiff also underwent a CT of the head in March 2004. (R. at 181.) The appearance of the brain was normal, but the testing showed an apparent bullet fragment in the parapharyngeal fat on the left. (*Id.*)

In November 2004, state agency psychologist John S. Waddell, Ph.D., reviewed Plaintiff's record and issued various opinions. Although Dr. Waddell indicated that Plaintiff suffered from a personality disorder, as well as alcohol abuse, he did not feel that Plaintiff met any of the mental disorder listing requirements within the Regulations. (R. at 161–70.) Dr. Waddell opined that Plaintiff had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (R. at 171.)

Dr. Waddell also evaluated Plaintiff's mental residual functional capacity. (R. at 175.) Dr. Waddell found no evidence that Plaintiff's understanding and memory were limited. (*Id.*) He further opined that Plaintiff was moderately limited in her ability to concentrate for extended periods; work with others without being distracted; and work a normal workday without interruptions from psychologically based symptoms. (R. at 176.) In discussing Plaintiff's social interaction, Dr. Waddell found Plaintiff markedly limited in her ability to interact with the general public and moderately limited in other categories. (R. at 176.) Finally, Dr. Waddell opined that Plaintiff was moderately limited in her ability to respond appropriately to changes in the workplace. (*Id.*)

In summarizing his findings, Dr. Waddell stressed that Plaintiff has a history of

---

745. "A GAF score of 71–80 indicates that any symptoms are transient, predictable reactions to psychological stressors and suggests no more than a slight impairment in functioning." *Yoakem v. Comm'r of Soc. Sec.*, No. 1:10–cv–639, 2011 WL 5870827, at *8 (S.D. Ohio Aug. 22, 2011).

malingering and, therefore, was only considered partially credible.  (R. at 177.)  Dr. Waddell indicated that Plaintiff's personality disorder would likely interfere with her ability to relate to others and deal with stress.  (R. at 177.)  Accordingly, he concluded that Plaintiff should not be expected to work closely with the general public.  (*Id.*)  Dr. Waddell did find, however, that Plaintiff could relate adequately to others on a superficial basis for work activity.  (*Id.*)  He also stressed again that there was no evidence of limitation in memory and understanding, and that Plaintiff was able to perform various tasks including household chores and keeping appointments.  (R. at 177.)

The records reflect that Plaintiff returned to counseling and treatment with North Community Counseling Center in 2006.[7]  (R. at 280–87)  In September 2006, Plaintiff was depressed as her mother had died in August.  (R. at 284.)  In October, Plaintiff presented as frustrated and upset primarily due to estate disputes.  (R. at 282.)  On December 5, 2006, Dr. Flanagan noted that Plaintiff's mood was euthymic and that Plaintiff had cooked for her nephew on Thanksgiving.  (R. at 280.)

During January 2007, Plaintiff reported having difficulty motivating herself, but also indicated that her medication was decreasing her depressive symptoms.  (R. at 279.)  In February 2007, Plaintiff was depressed due to problems with her son.  (R. at 278.)  In March 2007, Plaintiff reported stress and some depression and stated that she did not notice a difference in symptoms while on medication.  (R. at 276–77.)  Plaintiff's social worker reported in May 2007 that Plaintiff was having "difficultly maintaining medication as directed."  (R. at 292.)  The social worker diagnosed Plaintiff with a psychotic disorder, bipolar disorder, alcohol

---

[7] From the record, it appears Plaintiff received medication throughout 2006.  (R. at 311.)

dependence, and assigned her a GAF of 59.[8]  (*Id.*)

Plaintiff saw Dr. Flanagan from May 2007 through October 2008.  (R. at 294–305.)  Dr. Flanagan continued to diagnose Plaintiff with bipolar affective disorder and alcohol dependency, prescribing medication and counseling during this period.  (*Id.*)  In July 2007, Plaintiff reported that she had fallen "off [the] wagon" and drank two times since June.  (R. at 302.)  On November 7, 2007 Plaintiff reported being off her medication for a three to four day period.  (R. at 300.)  In January 2008, Plaintiff ran out of medication because she had missed appointments with Jobs and Family Services.  (R. at 298.)  On August 12, 2008, Dr. Flanagan noted that Plaintiff had not had an appointment since January and reported being out of medication for months.  (R. at 296.)

On July 24, 2007, Plaintiff underwent a neurobehavioral cognitive status examination.  (R. at 312.)  Plaintiff scored in the average range in various categories including level of consciousness, attention, language, and reasoning.  (*Id.*)  Tests reflected that Plaintiff's calculation was mildly impaired and her memory was very mildly impaired.  (R. at 312, 326.)

In October 2007, mental health providers referred Plaintiff to the Ohio State University TBI Network because of her history of traumatic brain injury ("TBI") and ongoing cognitive problems.  (R. at 319.)  Plaintiff stated that she had received blows to the head during numerous fights and that her nose was broken in June 2006.  (R. at 320.)  Plaintiff reported a history of alcohol abuse as well as marijuana and cocaine use.  (R. at 321.)  Plaintiff's case manager, April Smith, MSSA, LSW, diagnosed Plaintiff with alcohol dependency.  (R. at 325.)

Plaintiff continued to see Ms. Smith into 2009.  (R. at 326–42.)  Ms. Smith's progress

_____

[8]  A GAF from 51 to 60 "indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning."  *Karger*, 414 F. App'x at 743.

notes demonstrate that Plaintiff's compliance in taking her medication was varied. (*See id.*) Although Ms. Smith's progress notes indicate that Plaintiff was at times suffering from anxiety and paranoia, they contain no reports of hallucinations or delusions. (*Id.*) Ms. Smith's notations generally reflect that Plaintiff's mental condition was improved with medication. (*See id.*) Plaintiff, however, was at times concerned that her medication made her too nice when she needed to be "on the defense" due to issues with her son. (R. at 339.) In October 2008, Ms. Smith noted that Plaintiff was "torn between feeling stable but extremely tired on med[ication] and feeling alert but agitated off med[ication]." (R. at 340.)

Plaintiff also began receiving treatment from psychiatrist Stephen Bittner, M.D. in January 2009. At this time, Plaintiff described sporadic medication use. (R. at 351.) Dr. Bittner recommended management through medication and supportive therapy. (R. at 352.) In March 2009, Dr. Bittner diagnosed Plaintiff as bipolar, type I, and noted traumatic brain injury. (R. at 350.) He stressed at this time that Plaintiff should be taking all of her prescribed medications. (*Id.*) Following a May 2009 session, Dr. Bittner described Plaintiff's mood as "not bad," but also indicated that her judgment was poor and suggested that Plaintiff had "lots of memory problems." (R. at 347–48.) In coordination with Dr. Bittner, social worker Deidre Palmer began seeing Plaintiff in May 2009. (R. at 343–46.)

On June 15, 2009, Ms. Smith wrote a letter to Plaintiff's counsel regarding her condition. (R. at 342.) Ms. Smith stated "[o]verall, client is making progress towards her goals at the TBI Network and I anticipate closing her case as *successful* very soon." (*Id.* (emphasis in original).) Ms. Smith did encourage Plaintiff to remain in mental health treatment at this time. (*Id.*)

## IV. EXPERT TESTIMONY

Dr. Richard D. Oestreich testified as a vocational expert at the June 2009 administrative hearing. Dr. Oestreich classified Plaintiff's past work as chauffeur, medium and semiskilled; parking lot attendant, light and unskilled; plumber's helper, light and semiskilled; and psychic reader, semiskilled and sedentary. (R. at 458.)

ALJ Beran asked Dr. Oestreich to consider a hypothetical person, with the same basic characteristics as Plaintiff. ALJ Beran limited this person to simple routine, nonpublic tasks; occasional superficial interaction with others; no strict production quotas; and no work around hazardous equipment or machinery. (R. at 459, 462.) Dr. Oestreich testified that such a person would be able unable to perform Plaintiff's past work. (R. at 459.) Dr. Oestreich, however, estimated that Plaintiff could perform fifty percent of jobs at each exertional level. (R. at 460.) Dr. Oestreich estimated such a person could perform 20,000 medium jobs including janitor and dish washer; 22,500 light jobs; and 5,000 sedentary jobs in the Columbus area. (R. at 460–61.)

Dr. Oestreich testified that if Plaintiff's testimony was considered entirely credible she would be unable to perform any work. (R. at 461.) In reaching this conclusion, he cited Plaintiff's testimony as to reduced energy and mental activity. (R. at 461–62.) Finally, ALJ Beran asked Dr. Oestreich to consider a person limited to the extent Dr. Tilley opined in his mental residual functional capacity assessment. (R. at 152, 463.) Dr. Oestreich concluded that such limitations would be job preclusive. (R. at 463.)

# V. ADMINISTRATIVE DECISION

ALJ Beran found that Plaintiff was not disabled within the meaning of the Social

Security Act in her September 28, 2009 decision.[9]   At the first step of the sequential evaluation

process,[10] the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since

January 30, 2011.  (R. at 32.)

Next, the ALJ determined that Plaintiff has the severe impairments of a traumatic brain

injury, an affective disorder, and a substance abuse disorder.  (*Id.*)  The ALJ noted a lack of

contemporaneous medical evidence to support Plaintiff's traumatic brain injury, but indicated

she was giving Plaintiff the benefit of the doubt.  (R. at 35.)  Although the ALJ detailed

Plaintiff's alcohol and drug use, she concluded that Plaintiff is not functionally impaired by the

---

[9]  As a preliminary matter the ALJ concluded that Plaintiff met the insured status
requirements of the Social Security Act through June 30, 2005.  (R. at 32.)

[10]  Social Security Regulations require ALJs to resolve a disability claim through a
five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).  Although a
dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d
727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five
questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or
   equal the criteria of an impairment set forth in the Commissioner's Listing
   of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant
   perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and
   residual functional capacity, can the claimant perform other work
   available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

presence or absence of alcohol or elicit drugs.  (R. at 36.)  Accordingly, the ALJ determined that Plaintiff's drug and alcohol use was not material to the ultimate disability decision.  (*Id.*)

At step three, the ALJ then found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*) The ALJ specifically concluded that Plaintiff does not meet the listing requirements for neurological impairments or mental impairments.  (R. at 36–41.)  The ALJ found Plaintiff has mild impairment of activities of daily living; moderate restrictions in maintaining social functioning; and moderate restriction in maintaining concentration, persistence, or pace.  (*Id.*)

At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC").  The ALJ found that Plaintiff retained the physical ability to perform work at all exertional levels.  (R. at 41.)  Nevertheless, the ALJ found Plaintiff "mentally limited to low stress work, which in her case is defined as simple, routine, non-public, tasks without [] fast pace, strict product quotas, high production demands or more than occasional superficial interaction."  (R. at 41–42.)  In reaching this determination, the ALJ relied largely on the opinions of state agency psychologist Dr. Waddell.  (R. at 42.)  The ALJ gave the opinions of Drs. Tilley and Swearingen little weight.  (R. at 43–44.)  She felt both physicians relied too heavily on Plaintiff's subjective statements.  (*Id.*)  Additionally, the ALJ concluded that Plaintiff's testimony as to the extent of her symptoms was not entirely credible.  (R. at 50.)  The ALJ also implied that Plaintiff exaggerated her symptoms during her examinations with Drs. Tilley and Swearingen in order to become eligible for benefits.  (*See* R. at 44.)

Based on the above RFC, the ALJ found that Plaintiff could not perform her past relevant

work. ( R. at 50.)  The ALJ determined, however, relying on the testimony of Dr. Oestreich that

Plaintiff could perform a significant number of jobs in the national economy.  (R. at 51–52.)

Accordingly, the ALJ found that Plaintiff was not disabled within the meaning of the Social

Security Act.  (R. at 52.)

## VI. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. §

405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.

1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

evidence supports the [Commissioner's] decision, this Court defers to that finding 'even if there

is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)).  Finally, even if the Commissioner's decision meets the substantial evidence standard,

"'a decision of the Commissioner will not be upheld where the SSA fails to follow its own

regulations and where that error prejudices a claimant on the merits or deprives the claimant of a

substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d

742, 746 (6th Cir. 2007)).

## VII. LEGAL ANALYSIS

Plaintiff's primary contention within his Statement of Errors is that ALJ Beran failed to

follow the mandates of the Appeals Council's July 15, 2008 remand order when issuing her

decision.  Under this blanket contention, Plaintiff challenges the ALJ's weighing of examining-

source opinions; assessment of Plaintiff's mental impairments and traumatic brain injury;

determination as to Plaintiff's credibility; and failure to obtain additional evidence.  The

undersigned will first examine whether ALJ Beran committed procedural error by failing to

comply with the mandates of the Appeals Council.  Second, to the extent Plaintiff's briefing

justifies, the undersigned will consider whether any of the underlying issues that Plaintiff raises

necessitate remand.[11]

---

[11]  Within her eight page Statement of Errors, Plaintiff attempts to highlight several issues
through a series of bullet points.  Many of Plaintiff's contentions, however, lack detail and
development.  Additionally, Plaintiff's briefing wholly lacks citation to legal authority and
appropriate standards.  Defendant is correct that the Court may deem that a party has waived
issues he or she does not sufficiently develop.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–96
(6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at
developed argumentation, are deemed waived. It is not sufficient for a party to mention a
possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.")
(internal quotations omitted).  Although it is questionable whether Plaintiff has sufficiently
developed a number of the issues she mentions, the undersigned has given Plaintiff the benefit of
the doubt and will not deem them waived.

**A.      Appeal Council Remand**

Plaintiff contends that reversal is appropriate because ALJ Beran failed to follow the directives of the Appeals Council's July 15, 2008 remand order.  The undersigned disagrees. Even assuming that an ALJ's failure to follow an Appeals Council's remand order constitutes reversible error, the undersigned is satisfied that ALJ Beran satisfied the directives of the Appeals Council remand.

At the outset, some federal courts apparently disagree as to whether an ALJ's failure to follow an Appeals Council's directives may serve as independent grounds for reversal absent other error.  *See Miller v. Barnhart*, 175 F. App'x 952, 956 (10th Cir. 2006) (holding, that because "the Appeals Council found the []ALJ complied with its remand order . . . [I]t is appropriate to examine the Commissioner's final decision under our usual standards, rather than focusing on conformance with particular terms of the remand order"); *Huddleston v. Astrue*, 826 F. Supp. 2d 942, 954–55 (S.D.W.Va. 2011) (citing conflicting case law, but ultimately holding that "an ALJ's failure to follow the directives of [a] remand order issued by the Appeals Council constitutes legal error" that may, but will not always, necessitate remand).  For the purposes of the following analysis, the undersigned will assume, without deciding, that an ALJ's failure to follow the Appeals Council directives may serve as independent grounds for reversal.

As detailed above, on July 15, 2008, the Appeals Council granted Plaintiff's request for review of ALJ Armstrong's initial administrative decision and remanded the case for further consideration.  On remand the Appeals Council required ALJ Beran to (1) consider and explain the weight given to Dr. Tilley's opinion; (2) evaluate Plaintiff's mental impairments in accordance with 20 C.F.R. §§ 404.1520a, 416.920a; (3) determine whether alcoholism and drug

addiction are material to the disability determination; and (4) obtain additional evidence to complete the administrative record.[12]  (*See* R. at 66.)

Examination of the record and the September 2009 administrative decision reveal that ALJ Beran did not commit procedural error in responding to the Appeals Council's remand directives.[13]  First, ALJ Beran's decision included both a detailed summary of Dr. Tilley's opinions and reasons why she gave Dr. Tilley's opinions little weight.  (R. at 42–43.)  Second, as will be described further below, ALJ Beran applied the special technique required for mental impairments under the Regulations, including extensive evaluations of Plaintiff's daily activities; social functioning; and concentration, persistence, and pace.  (R. at 37–39); *see also Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 468 (6th Cir. 2006) (holding that the special technique embedded within 20 C.F.R. §§ 404.1520a, 416.920a "centers on the ALJ's rating the claimant's degree of limitation in three functional areas (activities of daily living; social functioning; and concentration, persistence, and pace) and then enumerating episodes of decompensation").  Third, ALJ Beran determined, after reviewing Plaintiff's history of alcohol and drug use, that drug and/or alcohol abuse was not material to the disability decision.[14]

---

[12]  Although the Appeals Council's remand order contained other directives, such directives were qualified, and left the ALJ with discretion to evaluate the need for further action. (R. at 66.)  For example, the remand order directed the ALJ to obtain medical expert testimony "if necessary" and to acquire a consultive mental examination "if warranted."  (R. at 66.) Furthermore, although Plaintiff cursorily raises issues regarding the remand order's vocational expert testimony requirements, such requirements appear to be inapplicable under the circumstances.  (*See* R. at 66.)  Specifically, ALJ Beran did not rely on transferable skills in finding Plaintiff could perform substantial work and did not find any conflicts between Dr. Oestreich's testimony and the Dictionary of Occupational Titles.  (R. at 51.)

[13]  Notably, the Appeals Council chose to deny Plaintiff's request for review of ALJ Beran's decision.  (R. at 4.)

[14]  Plaintiff does not appear to dispute this finding.

18

Upon review of the Appeals Council's mandatory directives, the closest call appears to be whether ALJ Beran satisfied the directive to obtain additional evidence. The Appeals Council's instruction regarding additional evidence was somewhat vague, and required the ALJ "to complete the administrative record in accordance with the regulatory standards regarding consultive examinations and existing medical evidence." (R. at 66.) The regulatory standards the Appeals Council cited, 20 C.F.R. §§ 404.1512–1513, 416.912–913, generally address the balance between the claimant's requirement to provide medical evidence and the Commissioner's duty to develop the record.

Here, following remand, ALJ Beran held her own administrative hearing at which both Plaintiff and a vocational expert testified. Additionally, the record reflects that the ALJ accepted and considered medical evidence related to matters that occurred after ALJ Armstrong's July 2007 decision. Although ALJ Beran did not obtain a medical expert to provide testimony, or require another consultive examination, the Appeals Council's directive did not indicate that the ALJ was required to acquire additional evidence of this nature. (*See* R. at 66.) Under these circumstances, and given the general ambiguity of this mandate, the undersigned cannot conclude that ALJ Beran erred in this regard.

**B.      Examining Source Opinions**

In terms of substantive challenges, Plaintiff contends that ALJ Beran erred in weighing the examining source opinions of Drs. Tilley and Swearingen.[15] As detailed above, Dr. Tilley diagnosed Plaintiff with schizoaffective disorder and Dr. Swearingen diagnosed Plaintiff with

_____

[15] Drs. Tilley and Swearingen issued opinions following consultive examinations of Plaintiff. The record does not reflect, however, that these physicians had an ongoing treatment relationship with Plaintiff. Accordingly, they are examining sources.

schizophrenia, paranoid type. Both Drs. Tilley and Swearingen assigned Plaintiff GAF scores suggesting extreme levels of functional impairment. Additionally, Dr. Tilley opined Plaintiff was unemployable from a psychological perspective. ALJ Beran gave the opinions of both Drs. Tilley and Swearingen little weight.

In deciding whether a claimant is disabled, an ALJ must consider all medical opinions along with any other relevant evidence. 20 C.F.R. §§ 404.1527(b), 416.927(b). In weighing medical opinions, an examining source is generally entitled to more weight than a non-examining source. 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1). Nevertheless, "[t]his is not a bright-line rule." *Dragon v. Comm'r of Soc. Sec.*, No. 09–4489, 2012 WL 987758, at *8 (6th Cir. Mar. 26, 2012). Among other considerations, the Commissioner must consider "[w]hether an opinion is consistent with the record as a whole or supported by relevant evidence . . . ." *Id.* Furthermore, examining physicians are not entitled to the deference or articulation requirements that the Regulations afford to treating physicians.[16] *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Finally, opinions on certain issues, such as whether a person is disabled or unable to work, are reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d).

Due to the nature of mental impairments, the diagnostic techniques that physicians in the field use are likely to be less tangible than those in other fields of medicine. *See Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989). Nevertheless, in weighing medical opinion

---

[16] Treating physician opinions are entitled to controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence . . . ." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Additionally, the Commissioner must "always give good reasons" for the weight he gives to a treating source opinion. *Id.*

evidence, an ALJ may still consider whether a physician has relied on a plaintiff's subjective complaints, and whether such complaints are credible. *See Pietrzak v. Comm'r of Soc. Sec.*, No. 3:11–cv–74, 2012 WL 510531, at *4 (S.D. Ohio Feb. 15, 2012) (holding that an ALJ was justified in rejecting the opinion of a treating physician in part because the opinion "rested more on Plaintiff's subjective reports than on his own clinical observations, and that in light of Plaintiff's credibility problems, this was another reasons to give little weight to [the] opinion"); *Cf. also Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 271–75 (6th Cir. 2010) (finding that an ALJ appropriately rejected the opinion of, and did not have to recontact, a treating psychiatrist when her opinion was based on "[claimant's] self-reported history and subjective complaints [and was] not supported by objective medical evidence . . .").

In this case, the undersigned finds that substantial evidence supports giving little weight to the opinions of Drs. Tilley and Swearingen. As ALJ Berran indicated, the medical record reflects that both of these doctors relied primarily, if not entirely, on Plaintiff's self reporting and subjective complaints in reaching their diagnoses and opinions. In reaching his conclusions, Dr. Tilley acknowledged that he did not have the benefit of reviewing Plaintiff's historical records and that personality testing was invalid due to potential exaggeration. (R. at 149–50.) Instead, Dr. Tilley based his opinions on Plaintiff's behavior during the interview and her self-reported symptoms. Likewise, Dr. Swearingen relied on Plaintiff's self reports, which included auditory and visual hallucinations as well as delusional thinking, in reaching his opinions. (*See* R. at 225–26.)

ALJ Beran, however, had sufficient reasons for questioning the credibility of Plaintiff's

presentation during these two interviews.[17]  Notably, Plaintiff's reports of symptoms and

behavior during these two interviews—both conducted to assess whether Plaintiff was eligible

for benefits—far exceeded the symptoms and behavior that the remainder of the medical record

reflects.  Furthermore, based on their review of the record, both Drs. Casterline and Waddell

suggested that the record provided reasons to suspect malingering.  (R. at 177, 217.)  A social

worker also indicated Plaintiff had exaggerated symptoms in a pervious examination in order to

gain assistance.  (R. at 241–42)

The examinations and ultimate opinions of Drs. Tilley and Swearingen are also

inconsistent with other medical evidence in the record.  Once again, Plaintiff's reports of

symptoms at the consultive examinations clearly exceed the symptoms reflected in other

treatment records spanning from 2002 until 2009.  Additionally, the diagnoses and GAF

assessments of Drs. Tilley and Swearingen were more extreme than those of various other

physicians and health care providers, including Dr. Flanagan.  For example, in March 2004,

approximately four months after Plaintiff's examination with Dr. Swearingen, Dr. Flanagan

assigned Plaintiff a GAF score of 70 to 75, indicating only mild to slight symptoms and

impairment.  (R. at 291.)  Dr. Waddell also issued less extreme opinions regarding Plaintiff's

functional ability.

Under these circumstances, ALJ Beran reasonably concluded that the opinions of Drs.

Tilley and Swearingen deserved only little weight.[18]  Although it might have been possible for

---

[17]  As detailed further below, the ALJ also had sufficient justification for questioning
Plaintiff's credibility in general.

[18]  Plaintiff also challenge ALJ Beran's conclusion that Dr. Tilley appeared to consider
issues outside his area of expertise.  Although this may be a reference to Dr. Tilley's conclusion

ALJ Beran to reach a different conclusion, she was well within the allowable zone of choice. *See Blakley*, 581 F.3d at 406 ("The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.") (internal quotations omitted).

**C.     Mental Impairments and Traumatic Brain Injury**

Plaintiff also contends that ALJ Berran erred in evaluating Plaintiff's mental impairments and her traumatic brain injury.  Although Plaintiff contends that ALJ Beran failed to follow 20 C.F.R. §§ 404.1520a, 416.920a in assessing her mental impairment, the undersigned cannot discern exactly how she believes ALJ Beran erred.  Additionally, Plaintiff appears to contend that the ALJ failed to properly evaluate Plaintiff's traumatic brain injury.

This Court has recently summarized the requirements of 20 C.F.R. §§ 404.1520a, 416.920a as follows:

> [T]he regulations provide a special procedure for evaluating the severity of a mental impairment at steps two and three for an adult. 20 C.F.R. § 404.1520a.  At step two, the ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment[]." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009) (citing 20 C.F.R. § 404.1520a(b)(1)). If so, the ALJ "must then rate the degree of functional limitation resulting from the impairment." *Id.* (citing 20 C.F.R. § 404.1520a(c)(3)).   The claimant's level of functional limitation is rated in four functional areas, commonly known as the "B criteria": 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. *Id.* (citing 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00 et seq.).  The degree of limitation in the first three functional areas is rated using the following five-point scale: none, mild, moderate, marked, and extreme. *Id.* (citing 20 C.F.R. § 404.1520a(c)(4)).

---

that Plaintiff was unemployable, an issue reserved to the Commissioner, the undersigned is uncertain of the precise meaning of ALJ Beran's reference.  If this were the ALJ's only reason for disregarding the opinions of Dr. Tilley, remand might be warranted.  For the reasons described above, however, ALJ Beran had sufficient justification for giving Dr. Tilley's opinion little weight.

> At step three of the sequential evaluation, an ALJ must determine whether the claimant's impairment "meets or is equivalent in severity to a listed mental disorder." *Rabbers*, 582 F.3d at 653–54. A claimant whose impairment meets the requirements of the Listings will be deemed conclusively disabled. *Id.* If the ALJ determines that the claimant has a severe mental impairment that neither meets nor medically equals a listed impairment, the ALJ will then assess the claimant's RFC before completing steps four and five of the sequential evaluation process. *Id.* (citing 20 C.F.R. § 404.1520a(d)(3)).

*Lane v. Astrue*, — F. Supp. 2d —, —, 2012 WL 887490, at *14 (S.D. Ohio 2012).

In this case, ALJ Beran did not err in evaluating Plaintiff's mental impairments. Based on a review of the medical record, ALJ Beran concluded Plaintiff's severe impairments included affective disorder and a substance abuse disorder. (R. at 32–36.) ALJ Beran then evaluated the "B criteria," ultimately concluding that Plaintiff had mild impairments of activities of daily living; moderate restrictions in social functioning; moderate restrictions in maintaining concentration, pace, or persistence; and no episodes of decompensation. (R. at 37–41.) ALJ Beran also considered whether Plaintiff satisfied the listing requirements for a mental disorder. (R. at 36–41.) Finally, in evaluating Plaintiff's RFC, ALJ Beran accounted for Plaintiff's mental impairments, determining that Plaintiff must be limited to low stress work, defined as simple, routine, non-public, tasks that were not fact paced, with no strict production or high production demands, and no more than occasional superficial contact with others. (R. at 41–42.) Once again, from Plaintiff's briefing it is simply unclear how ALJ Beran's decision fell short of the requirements of 20 C.F.R. §§ 404.1520a, 416.920a.

Additionally, substantial evidence supports the ALJ Beran's mental impairment findings. ALJ Beran's B criteria and RFC findings generally track the conclusions of Dr. Waddell whose opinions the ALJ emphasized she was adopting. (R. at 42.) ALJ Beran's mental impairment determinations also appear to be generally consistent with other medical evidence. For example,

Dr. Flanagan, who would eventually become Plaintiff's treating psychiatrist, assigned a GAF score indicating only mild symptoms.[19]  A 2007 neurobehavioral cognitive status examination revealed average scores in various categories including level of consciousness, attention, language, and reasoning, and  reflected that Plaintiff's memory was only very mildly impaired. (R. at 312, 326.)  Furthermore, ALJ Beran supported her conclusions with details from Plaintiff's testimony, treatment notes, and disability applications, including the activities she is able to perform.

The undersigned also finds that ALJ Beran did not err in assessing Plaintiff's traumatic brain injury.  Although Plaintiff received treatment from The Ohio State University's TBI Network, evidence regarding the actual impact of Plaintiff's traumatic brain injury is limited.  As ALJ Beran noted, Plaintiff failed to provide medical evidence contemporaneous with the period she sustained the injury.  Cognitive testing was essentially normal, revealing only mild impairments in a few areas.  Despite these factors, ALJ Beran gave Plaintiff the benefit of the doubt, finding traumatic brain injury to be a severe impairment.  Outside of Plaintiff's own subjective complaints, the record contains no indication that traumatic brain injury restricts Plaintiff in a manner for which the RFC assessment did not account.  Under these circumstances, Plaintiff's cursory contentions regarding the ALJ's assessment of traumatic brain injury are unavailing.

---

[19]  Although Dr. Flanagan was likely only an examining physician at the time he assigned this GAF score, his later treatment notes do not reflect a change in this assessment.

**D.      Credibility**

Plaintiff also appears to take issue with ALJ Beran's credibility determination.[20]  The

undersigned finds Plaintiff's contentions in this regard to be without merit.

In evaluating a claimant's credibility as to subjective complaints of symptoms, an ALJ

must engage in a two-part analysis.  *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th

Cir. 2011).  First, an ALJ must assess whether the claimant has a medically determinable

impairment that could reasonably cause the alleged symptoms.  *Id.*  Second, the ALJ must

consider the claimant's credibility as to the intensity of such symptoms by considering the

objective medical evidence as well as a variety of other factors including daily activities and

treatment history.  *Id.* (citing 20 C.F.R. § 404.1529(c)).  The United States Court of Appeals for

the Sixth Circuit has explained as follows:

> [A]n ALJ's findings based on the credibility of the applicant are to be accorded great
> weight and deference, particularly since an ALJ is charged with the duty of
> observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment
> of a claimant's credibility must be supported by substantial evidence.

*Id.* (internal quotations omitted).

In this case, ALJ Beran acted within her discretion in finding Plaintiff not entirely

credible.  ALJ Beran listed, and explained, several legitimate reasons for this conclusion

including Plaintiff's alleged onset date,[21] daily activities, poor work record, failure to comply

---

[20]  The vocational expert testified that if Plaintiff was entirely credible she would be
incapable of work.  (R. at 461.)  Plaintiff highlights this testimony, without further development,
in her briefing.  Because the ALJ did not find Plaintiff entirely credible, this testimony was not
relevant to the ALJ's analysis.

[21]  It does not appear Plaintiff was receiving or seeking any medical treatment at the time
of her alleged onset date.

with treatment, and tendency to make inconsistent statements. Plaintiff contends that ALJ Beran fails to account for her overall condition, including periods of homelessness and lack of benefits, in reaching this decision. Although Plaintiff's overall condition may offer another explanation for her relatively inconsistent treatment record, in light of the various factors highlighted within the administrative decision, it was reasonable for the ALJ to conclude from the record evidence that Plaintiff was not entirely credible.

## E. Additional Evidence

Throughout Plaintiff's Statement of Errors, she faults the ALJ for failing to obtain additional evidence. The undersigned finds no independent error on this grounds.

An ALJ has a duty to develop the record and "ensur[e] that every claimant receives a full and fair hearing."[22] *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 189 (6th Cir. 2009) (internal quotations omitted). Nevertheless, "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986). Additionally, "[a]n ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001).

Here, the ALJ did not err in failing to obtain additional evidence. ALJ Beran reached her decision based on a record that contained extensive treatment and counseling notes spanning

---

[22] Under special circumstances, such as when a claimant is unrepresented, the Court considers this duty "heightened." *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008). In this case, however, Plaintiff was represented by counsel during the administrative hearing, and, therefore, ALJ Beran had no such heightened duty.

from 2002 to 2009.  This record included the treatment notes of Plaintiff's treating physicians. In addition to the opinions of Drs. Tilley and Swearingen, the record contained the opinions and mental RFC assessments provided by Dr. Waddell, which he issued well after Plaintiff's alleged onset date.  Dr. Waddell appears to have accounted for Plaintiff's possible exaggeration during her earlier examinations.  Additionally, the record contains the results of a  neurobehavioral cognitive status examination from July 2007.  Under these circumstances, the undersigned cannot conclude that ALJ Beran abused her discretion in failing to seek additional evidence.

## VIII.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Court **AFFIRM** the decision of the Commissioner of Social Security.

## IX.  NOTICE

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district

court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that

defendant waived appeal of district court's denial of pretrial motion by failing to timely object to

magistrate judge's report and recommendation).  Even when timely objections are filed, appellate

review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994

(6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the

issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date: June 13, 2012                                      ___/s/ *Elizabeth A. Preston Deavers*___
                                                                   Elizabeth A. Preston Deavers
                                                                   United States Magistrate Judge